**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

v.                                             **CASE NO. 22-20032-DDC**

**ERNEST LUCAS,**

**Defendant.**

**RESPONSE TO DEFENDANT'S MOTION FOR *FRANKS* HEARING AND TO**
**SUPPRESS EVIDENCE**

The United States of America, by and through Kate E. Brubacher, United States Attorney

for the District of Kansas, and Michelle McFarlane, Assistant United States Attorney,

respectfully requests that the Court deny the defendant's Motion for *Franks* Hearing and to

Suppress Evidence (Doc. 105).  In support of its position, the government sets forth the

following:

**Factual Background**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Kansas City initiated

an investigation into members of the South Dale Blood Gang in approximately March of 2022.

The investigation was part of an initiative in hopes of reducing violent crime in the Kansas City

area.  During the investigation, members of the ATF and Kansas City Kansas Police Department

(KCKPD) focused on persons believed to be involved in crimes ranging from violent crime to

firearm and narcotic trafficking.

*1. Chaz Hicks*

The investigation focused on, among others, Chaz Hicks, a suspected methamphetamine

trafficker.  Beginning in late March, ATF undercover officers contacted Hicks in an effort to buy

quantities of methamphetamine from him.  An ATF undercover purchased methamphetamine

from Hicks on April 21, 2022, April 28, 2022, May 10, 2022 and May 25, 2022.  On April 15,

2022, ATF requested and secured a court order enabling them to track the GPS location

information associated with Hick's known cell phone number.  ATF began receiving GPS

location information on April 16, 2022.

*2. Identification of 875 Ruby and Ernest Lucas*

As part of the investigation, ATF received information Ernest Lucas was potentially

distributing drugs from a house on Ruby Ave.  On May 11th, 2022, members of ATF installed a

surveillance camera affixed to utility pole close to 875 Ruby Ave.  ATF immediately noticed the

number of vehicles that would arrive and leave in short timeframes.

On May 12, 2022, ATF Task Force Officer (TFO) Blackman communicated with

KCKPD patrol officers about the address at 875 Ruby Ave. TFO Blackman spoke with Officer

Paulakovich. Officer Paulakovich had been concentrating police activity on the residence for the

last six to eight weeks.  According to Officer Paulakovich, he began focusing on the residence

due to the suspicion of narcotic activity. He said numerous vehicles had fled from officers when

officers attempted to stop them for traffic infractions after leaving the residence. Officer

Paulakovich said in the last six to eight weeks, at least five different vehicles have fled from

officers when they attempted to stop them. He was able to describe each vehicle that fled. Officer

Paulakovich also said he has seen a high volume of vehicles in and out of the residence during

the evening hours.

*3. Buy on May 25, 2022*

On May 25, 2022, and ATF undercover purchased approximately 180 grams of

methamphetamine from Hicks.  Investigators conducted surveillance of Hicks prior to the

undercover operation.  Investigators observed, on elevated security camera footage, Hicks

arriving at Lucas's house at 875 Ruby at approximately 1:40 p.m. [1]



At about 1:48 p.m., Hicks walked back to his Dodge Charger and retrieved a red and black

backpack, and then walked back to 875 Ruby with the backpack.

---

1 The photos included in this Response are still photos from the pole camera footage captured outside of 875 Ruby
Avenue.  The government intends to also introduce these photos as exhibits at the Motion hearing.



At about 2:27 p.m., the ATF undercover called Hicks to order half a pound of methamphetamine. Hicks told the undercover he was in Argentine. Hicks also said: "I got it on me right now." At approximately 2:57 p.m., Hicks walked back to his car with the backpack and appeared to leave the area.



ATF followed Hicks from Ruby Ave to Metropolitan Ave and eventually to I-635. While following him north on I-635, TFO Blackman watched Hicks's car drive over Swatz Road on I-635.  While following Hicks, it began to rain and TFO Blackman could not maintain surveillance, so TFO Blackman turned off I-635.  TFO Blackman last saw Hicks's car at the I-635/I-70 interchange.  At approximately 3:11 p.m., the ATF undercover contacted Hicks, and Hicks asked the undercover to meet him at City Gear in Kansas City, Kansas.  ATF knew there was a City Gear at 4848 State Ave in Kansas City, Kansas, approximately two miles from the I-635/I-70 interchange.  ATF surveillance arrived at City Gear and located Hicks's car at the parking lot. At approximately 3:25 p.m., ATF undercover officers saw Hicks's car at City Gear. Hicks was not in his car, leading investigators to believe he was inside the City Gear.  Hicks exited the City Gear carrying merchandise.  Hicks called at approximately 3:45 p.m. to set up the deal across the street from the City Gear.  The deal occurred a short time later in Hicks's car.

5

Hicks placed a red and black backpack in his lap and began removing different sandwich sized

baggies of clear, crystal-like substance out of his backpack.  Hicks handed one of the bags with

the crystal-like substance to the ATF undercover and sold it to her.

*4. The pole camera*

     ATF installed an elevated surveillance camera (a pole camera) outside of 875 Ruby Ave.

The camera was affixed to a utility pole outside of 875 Ruby Ave.  The camera recorded

constantly from May 11, 2022 through July 6, 2022.  Law enforcement viewing the camera had

the ability to zoom in and out while viewing the camera live, but not after the footage was

recorded.  The recorded footage is kept and maintained by law enforcement.

     ATF utilized the pole camera footage to monitor Lucas's criminal conduct as well as

identify co-conspirators.  In reviewing the camera footage, ATF observed Lucas and others

possessing firearms outside of the residence.  Hicks was observed almost daily at 875 Ruby Ave.

During this time, ATF observed Hicks meet with various people in short timeframes leading

ATF to believe he was serving people narcotics outside the address.  On June 22, 2022,

investigators saw Hicks arrive at 875 Ruby Ave and meet with Lucas in the street.  Lucas could

be seen meeting with Hicks, walking back in the direction of 875 Ruby Ave, and returning a

couple of minutes later and handing Hicks a large white square object that looked to

investigators like a gallon size plastic bag of methamphetamine.  Hicks appeared to give the bag

of suspected methamphetamine to another individual who placed it in his car before leaving the

area.

*5. The search of 875 Ruby Ave*

     Using information gathered from the investigation, including information obtained from

viewing the pole camera footage, ATF investigators applied for a search warrant of 875 Ruby

Ave and received authorization to search on July 1, 2022.[2]  ATF and other members of law enforcement searched 875 Ruby Ave on July 6, 2022.  During the search, investigators located eleven firearms, assorted ammunition, currency, methamphetamine, and a cellular phone.

## Procedural History

Defendant Ernest Lucas was charged by complaint on July 7, 2022 with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1) and one count possession with intent to distribute fifty grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §841(a)(1) &(b)(1)(B)(viii). Doc. 1.  Lucas was indicted on these same charges on July 27, 2022.  Doc. 9.  The Superseding Indictment was filed on August 24, 2022, charging Lucas and others with one count of conspiracy to distribute and possess with intent to distribute more than 50 grams methamphetamine in violation of 21 U.S.C. §846 (Count 1), one count of being a felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1) (Count 9) and one count possession with intent to distribute fifty grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §841(a)(1)&(b)(1)(B)(viii). Doc. 15. The Third Superseding Indictment was filed on March 8, 2023. Doc.  76.  Lucas was charged in the Third Superseding Indictment with the same charges as the Second Superseding Indictment. Doc. 47.

---

2 Honorable Magistrate Judge Teresa J. James authorized the search warrant on July 1, 2022.  *See* 22-8130-TJJ, Docket Entry 1, hereinafter referred to as "the affidavit and application for search warrant" or cited by case number and page number.

Lucas filed two Motions on September 19, 2023: a Motion to Dismiss Count 9 of the

Third Superseding Indictment (Doc. 104) and a Motion for *Franks* hearing and to Suppress

Evidence (Doc. 105). The hearing on these Motions is currently set for October 31 at 9:00 a.m.

## Argument and Authority

### A. Lucas's Motion to Suppress Should be Denied.

Lucas's claim that the footage from the pole camera should be suppressed because it was

collected without a warrant in violation of the Fourth Amendment is squarely foreclosed by

Tenth Circuit precedent in *United States v. Jackson*, 213 F.3d 1269, 1280 (10th Cir.), judgment

vacated on other grounds, 531 U.S. 1033 (2000),[3] which has not been abrogated by recent

developments in the Supreme Court's Fourth Amendment jurisprudence. Even if *Jackson* were

no longer good law, the pole-camera footage should not be suppressed under the good faith

exception to the exclusionary rule.

1. *The video monitoring and recording of the street outside of Lucas's house was not an illegal Fourth Amendment search.*

The Fourth Amendment provides, in pertinent part: "The right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

be violated[.]" Under Supreme Court precedent, the "government conduct can constitute a

Fourth Amendment search *either* when it infringes on a reasonable expectation of

privacy *or* when it involves a physical intrusion (a trespass) on a constitutionally protected space

or thing ('persons, houses, papers, and effects') for the purpose of obtaining information."

---

3 The Supreme Court vacated the judgment in *Jackson* and remanded for further consideration of possible sentencing error under the Court's intervening decision in *Apprendi* v. *New Jersey*, 530 U.S. 466 (2000). This Court subsequently determined that Jackson's sentence was invalid under *Apprendi* but determined that "the panel's decision on all other issues raised on direct appeal but not impacted by *Apprendi*"—including the constitutionality of pole cameras—"stands and is incorporated herein." *United States* v. *Jackson*, 240 F.3d 1245, 1247 n.2 (10th Cir. 2001).

*United States* v. *Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016).  Because there was no physical intrusion effected by the pole camera, Lucas's Fourth Amendment claim relies on the "reasonable expectation of privacy" theory.  Doc. 105 at 12.  This requires Lucas to show (1) "he had a subjective expectation of privacy" that the government intruded upon, and (2) "society is prepared to recognize that expectation as reasonable."  *United States* v. *Wells*, 739 F.3d 511, 522 (10th Cir. 2014).  He can show neither.

2. *Lucas lacked a subjective expectation of privacy in his movements in the middle of the street outside his house.*

Lucas has not provided sufficient support for his contention that he had a subjective expectation that the street outside of his house would be free from observation by others.  Lucas argues that he had an "especially strong" expectation of privacy because his home is located in "an isolated part of Kansas City," there are no neighbors "across the street or next door to him" and "[t]he end of his street is dead-end."  Doc. 105 at 14.  If it's true that Lucas need only assert a subjective expectation of privacy, the subjective expectation of privacy requirement would be meaningless.  *United States* v. *Henderson*, 190 Fed. Appx. 667, 674 (10th Cir. 2006) (unpublished) (finding an individual did not have a subjective expectation of privacy in an outbuilding that he merely had permission to be in); *see also Kee* v. *City of Rowlett*, 247 F.3d 206, 216 (5th Cir. 2001) (affidavits asserting that certain communications "should be private" do not suffice).  Lucas's argument is essentially that he has shown he had a subjective expectation of privacy simply because he moved to a more isolated area.  "Obviously, however, a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered." *Rakas* v. *Illinois*, 439 U.S. 128, 143 n.12 (1978).

Here, Lucas does not argue that he has an expectation of privacy in the area the pole camera actually captured, or, the street outside his house.  Instead, he points to his reasonable expectation of privacy in his *private* property. Doc. 105 at 14 ("*Carpenter* compels the reconsideration of the propriety or warrantless, intentional and prolonged law enforcement video surveillance of private property").  Even if *Carpenter* did compel the court to look to intrusions on private property, that reconsideration would not apply to Lucas because everything he argues about having been surveilled in violation of the Fourth Amendment occurred in the middle of the street on public property.

Lucas has not established that his private property (his home) was surveilled in violation of the Fourth Amendment.   Lucas has included in his motion still camera shots of the pole camera recordings, but none of the pictures show the outside of Lucas's home.  One purports to show how the pole camera captured Lucas's driveway, and another a portion the home on Lucas's property.  Doc. 105 at 7-9.  None of these images, however, show the front of Lucas's home, and the still images that show part of a structure are obfuscated by trees.  The government anticipates testimony at the Motion hearing will confirm that the placement of the pole camera was such that, even when you manipulated the view of the camera, you could not see the full front of Lucas's home. The pole camera was not affixed directly facing Lucas's home.  Even if Lucas had a subjective expectation of privacy in his private property, his argument does not extend to the street outside of his home.  Lucas must establish that he has a subjective expectation of privacy in the area he claims the government intruded on in violation of the Fourth Amendment, and Lucas has not done so.

Lucas relies on cases like *Kyllo* and *Carpenter* to support this argument, but both *Kyllo* and *Carpenter* present entirely different factual situations from what is present in this case.  The

10

Court in *Kyllo* found use of a device that is not in general public use (i.e., a thermal-imaging device) to explore details of the interior of a private home that would previously have been unknowable without physical intrusion is a search under the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27 (2001). Here, the front of Lucas's home is not even visible when viewing the pole camera footage, let alone the interior of his home, so it completely factual distinct from *Kyllo* and other such cases that involve a person's reasonable expectation of privacy in the interior of his or her home. *Kyllo* and other such cases do not have any application in the factual scenario presented here.

Lucas utilizes precedent in *Carpenter* to argue he had a subjective expectation of privacy "in his movements over time." Doc. 105 at 13. *See Carpenter v. United States*, 585 U.S.----, 138 S.Ct. 2206 (2018). As is argued more fully below, *Carpenter* is so factually distinct from this case and was so narrowly decided that its application does not make sense in this context. Additionally, Lucas fails to connect his subjective expectation of privacy to his argued expectation of freedom of movement. If a defendant could establish a subjective expectation of privacy based on the mere expectation that conduct otherwise observable by the general public would not be observed in the specific manner used by law enforcement, this element of the Fourth Amendment inquiry would be a nullity.

   *2. Lucas's claimed expectation of privacy is not objectively reasonable.*

The expectation of privacy Lucas asserts here is objectively unreasonable. Lucas argues it is "reasonable for people to expect that the government will not point a sophisticated camera at their property to record their comings and goings for nearly two months." Doc. 105 at 14. However, the Tenth Circuit considered a similar question in *Jackson* and rejected the same arguments. *United States* v. *Jackson*, 213 F.3d 1269, 1280 (10th Cir.), judgment vacated on

other grounds, 531 U.S. 1033 (2000).  The Tenth Circuit's decision in *Jackson* remains sound and binds this court.  In *Jackson*, just like in this case, law enforcement installed a pole camera that overlooked the defendant's residence.  The camera, like the one here, "could be adjusted by officers at the police station, and could zoom in close enough to read a license plate," but could not "record sound" or "view the inside of the house[]."  *Id.* at 1276.  The Court affirmed the denial of the defendant's motion to suppress evidence yielded by the pole camera, holding that she "had no reasonable expectation of privacy that was intruded upon by the video camera[]" because the camera was "capable of observing only what any passerby would easily have been able to observe."  *Id.* at 1281; *accord United States v. Cantu*, 684 Fed. Appx. 703, 704-706 (10th Cir. 2017) (unpublished) (applying *Jackson*).  That holding squarely applies here.   Any passerby would have been able to observe the front of Lucas's home and would have been able to observe the activities that took place in the public street in front of his home, and Lucas therefore has no reasonable expectation of privacy in the areas captured by the pole camera footage.

*Jackson* follows from Supreme Court precedent.  213 F.3d at 1280-1281.  In *Kyllo* v. *United States*, 533 U.S. 27 (2001), the Court explained that warrantless visual surveillance of the home "was unquestionably lawful" under the traditional, trespass-based conception of the Fourth Amendment "because the eye cannot … be guilty of a trespass."  *Id.* at 31-32 (internal quotation marks omitted).  And the approval of such surveillance survived the advent of the "reasonable expectation of privacy" test, because society does not recognize a legitimate expectation that "law enforcement officers [will] shield their eyes when passing by a home on public thoroughfares."  *Id.* at 33 (citation omitted); *see also United States* v. *Jones*, 565 U.S. 400, 412 (2012) ("This Court has to date not deviated from the understanding that mere visual observation does not constitute a search."); *New York* v. *Class*, 475 U.S. 106, 114 (1986) ("The exterior of a

car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'").

As noted above, *Kyllo* distinguished these principles from the use of a thermal-imaging device to detect evidence *inside* the defendant's house—radiation consistent with lamps used to grow marijuana indoors—which the Court deemed a search based on the well-settled expectation of privacy against intrusion into one's home. *See* 533 U.S. at 40 (emphasizing that such information "would previously have been unknowable without physical intrusion"). *Kyllo* further illustrated this distinction with a hypothetical that is particularly germane here: "The police might, for example, learn how many people are in a particular house by setting up year-round surveillance; but that does not make breaking and entering to find out the same information lawful." *Id.* at 35 n.2.

Consistent with *Kyllo*'s analysis, the Supreme Court has upheld the technology-assisted visual inspection of the *outside* of a home and other protected places—even observation conducted in considerably more exotic and unexpected ways than via pole camera. In *Ciraolo*, the Court held that the police's aerial observation of the defendant's backyard from an airplane did not constitute a Fourth Amendment search. 476 U.S. at 215. Although the dissenting Justices disagreed with the majority's conclusions regarding the privacy implications of aerial surveillance, they acknowledged that "[c]omings and goings on public streets are public matters, and the Constitution does not disable police from observing what every member of the public can see." *Id.* at 224 (Powell, J., dissenting); *see also Florida* v. *Riley*, 488 U.S. 445 (1989) (upholding similar warrantless observation of a residence from a helicopter). Another case decided the same day as *Ciraolo* added that aerial photography did not constitute a search, either.

*Dow Chem. Co.* v. *United States*, 476 U.S. 227 (1986).  "The mere fact that human vision is

enhanced somewhat," the Court held, "does not give rise to constitutional problems."  *Id.* at 238.

*Jackson* faithfully applied these precedents.  213 F.3d at 1280-1281.  In fact, consistent

with *Jackson*, "no federal circuit court has found a Fourth Amendment search based on long-

term use of pole cameras on public property to view plainly visible areas of a person's home."

*United States* v. *Tuggle*, 4 F.4th 505, 522 (7th Cir. 2021), cert. denied, 142 S. Ct. 1107 (2022);

*see United States* v. *Houston*, 813 F.3d 282, 287-288 (6th Cir. 2016); *United States* v. *Bucci*, 582

F.3d 108, 116-117 (1st Cir. 2009); *United States* v. *Vankesteren*, 553 F.3d 286, 288-291 (4th Cir.

2009); cf. *United States* v. *Cuevas-Sanchez*, 821 F.2d 248, 250-251 (5th Cir. 1987) (finding a

search where police installed a pole camera to see over the defendant's privacy fence).

Lucas argues that Tenth Circuit precedent such as *Cantu* and *Jackson* are no longer

controlling in light of *Carpenter*. Doc. 105 at 17. *Carpenter* goes out of its way not to disturb

precedents like *Jackson*, and no circuit has yet found otherwise.

*Carpenter* held that the collection of seven days' worth of historical cell-site location

information (CSLI), providing "a comprehensive chronicle of the user's past movements,"

constitutes a Fourth Amendment search.  138 S. Ct. at 2211; see *id.* at 2217 n.3.  The Supreme

Court explained that its decision was "a narrow one" and did not "call into question," let alone

invalidate, the use of "conventional surveillance techniques and tools, such as security cameras."

*Id.* at 2220.  This caveat was consistent with the *Carpenter* Court's recurring theme that it was

faced with a new technological innovation that existing Fourth Amendment doctrine did not

control.  *See*, *e.g.*, *id.* at 2219 (citing "seismic shifts in digital technology").

A pole camera likely qualifies as a "security camera," which is "a camera that records

images in or outside a building or in a public place, in order to prevent or help solve crime

14

there." *Cambridge English Dictionary* (accessed October 5, 2023), https://dictionary.cambridge.org/us/dictionary/english/security-camera (emphasis added). And in any event, pole cameras are plainly "conventional surveillance techniques [or] tools." *Carpenter*, 138 S. Ct. at 2220. "Pole cameras are routinely used by law enforcement across the United States in order to conduct investigations and have been for many years." *United States v. Moore-Bush*, 36 F.4th 320, 364 (1st Cir. 2022) (Lynch, Howard, and Gelpí, JJ., concurring); *see also id.* at 363-364 & n.36 (collecting two dozen federal cases involving pole cameras). Pole cameras "clearly qualify as a 'conventional surveillance technique'" within the meaning of *Carpenter*. *United States v. Tuggle*, 4 F.4th 505, 526 (7th Cir. 2021).

*Carpenter* would not undermine *Jackson* even if it did not include the "conventional tools" disclaimer. *Carpenter* involved a form of investigation very different from pole-camera monitoring: collection of historical cell-site location information. A very different technology unsurprisingly raises very different Fourth Amendment concerns. The Supreme Court reasoned in *Carpenter* that, because the typical person carries his cell phone pretty much everywhere he goes, CSLI can give police "a detailed and comprehensive record of the person's movements," thereby implicating his "expectation of privacy in his physical location and movements." 138 S. Ct. at 2215, 2217; see also *Jones*, 565 U.S. at 415-416 (Sotomayor, J., concurring). The Court found that CSLI effectively enables law enforcement to retrospectively surveil a person with great precision and at little cost—a striking departure from what "traditional investigative tools," like a tail of the suspect's vehicle, can offer. *Carpenter*, 138 S. Ct. at 2217-2218. CSLI is also nonpublic information held by wireless carriers, so *Carpenter* had to reckon with the "third-party doctrine," which restricts individuals' Fourth Amendment rights in information they "voluntarily

15

turn[] over to third parties." *Id.* at 2216 (quoting *Smith* v. *Maryland*, 442 U.S. 735, 743-744 (1979)).

Pole cameras do not implicate many of those issues. For one, pole cameras do not compile a comprehensive record of a person's movements; they record a person's activity in a single location. When that location is the home, the camera can admittedly "capture an important sliver of [the person's] life"—but it "d[oes] not paint the type of exhaustive picture of his every movement that the Supreme Court has frowned upon." *Tuggle*, 4 F.4th at 524. Pole cameras offer advantages over other forms of surveillance, such as physical surveillance, and in this case, due to the placement of Lucas's house on a dead-end street with limited areas where law enforcement could surveil, there are disadvantages as well, such as limited field of view, inability to record audio. Here, as noted above, the pole camera was placed on a utility pole such that it did not even capture the front of Lucas's home which was clearly visible from another part of the street. More importantly, however, pole cameras do not fundamentally alter the capabilities of law enforcement, which has always been capable of covertly monitoring a suspect's residence—a single location, not a constantly moving target—for extended periods. *See, e.g.*, *Kyllo*, 533 U.S. at 35 n.2; *but cf. Tuggle*, 4 F.4th at 526 (doubting the plausibility of an 18-month stakeout). Here, the pole camera captured footage from May 11 2022 through July 6, 2022, or for about eight weeks. Given this relatively limited time period, the pole camera did not fundamentally alter the ability of law enforcement to observe the goings on in the street in front of Lucas's home. Pole cameras only observe what individuals expose to any onlooker, rather than information that individuals entrust to specific third parties, see *Carpenter*, 138 S. Ct. at 2216-2217, and thus implicate Fourth Amendment values less acutely. Intervening Supreme Court precedent undoes circuit precedent like *Jackson* only when it "*contradicts* or *invalidates*"

16

the circuit rule, *Brooks*, 751 F.3d at 1210, and that test is not satisfied merely because a Supreme Court decision, framed at a high level of generality, involves related issues.

Other circuits' treatment of *Carpenter* further signals that *Jackson* remains good law.  *See United States v. Salazar*, 987 F.3d 1248,1260 (10th Cir 2021) (consulting sister circuits for the same purpose).  No circuit has held that *Carpenter* upset the preexisting consensus that pole-camera surveillance is not a Fourth Amendment search, and several have explicitly distinguished *Carpenter* from pole cameras.  *See United States* v. *Dennis*, 41 F.4th 732, 741 (5th Cir. 2022), cert. denied, No. 22-6473, 2023 WL 3937640 (June 12, 2023); *Tuggle*, 4 F.4th at 525; *United States* v. *May-Shaw*, 955 F.3d 563, 567-568 (6th Cir. 2020); *see also Leaders of a Beautiful Struggle* v. *Baltimore Police Dep't*, 2 F.4th 330, 345-346 (4th Cir. 2021) (en banc).  The closest any court of appeals has come to disagreeing was in *Moore-Bush*, 36 F.4th 320, where the First Circuit split evenly on the matter.  *United States v. Moore-Bush*, 36 F.4th 320 (1st Cir 2022) (en banc).

Lucas would fail the "reasonable expectation of privacy" test even if *Jackson* and the other precedents discussed above did not exist.  "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  *Rakas* v. *Illinois*, 439 U.S. 128, 143 n.12 (1978).  There is no such support for a claim to privacy against visual observation of unconcealed areas outside the home—especially, as here, the street outside the front of a home and the bottom part of a person's driveway.

As a matter of common sense, this kind of claim does not reflect "understandings that are recognized and permitted by society."  *Rakas*, 439 U.S. at 143 n.12.  The government submits it is consistent with most Americans' expectation that the front of a home is open to view by

17

members of the public; this is why many homeowners make special efforts to decorate and landscape these areas, use them to post political signs, etc.  *See United States* v. *Hayes*, 551 F.3d 138, 145 (2d Cir. 2008) ("The sanctuary of the home simply does not extend to the front yard[.]").  Some narrow segment of society may take a different view, to be sure, but nothing approaching the strong consensus required to cement a societal understanding in constitutional law.  Here, Lucas in particular did nothing to obstruct the front of his house from that street, and he carried out his activities in the middle of the public street and in view of the pole camera and any members of the public who were on the street at the time.  Lucas has not established that his claimed expectation of privacy is reasonable, and the court should reject his argument.

4. *The good faith exception to the exclusionary rule would apply to the pole camera footage in any event.*

Even supposing the pole-camera footage were obtained in violation of the Fourth Amendment, it should be admissible under the good-faith exception to the exclusionary rule. The Court is free to "proceed directly to" this issue "without first addressing the underlying Fourth Amendment question."  *United States* v. *Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000).

The exclusionary rule is a "judicially created remedy" that is "designed to deter police misconduct rather than to punish the errors of judges and magistrates."  *United States* v. *Leon*, 468 U.S. 897, 906, 916 (1984) (citation omitted).  To justify suppression, a case must involve police conduct that is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system" in suppressing evidence.  *Herring* v. *United States*, 555 U.S. 135, 144 (2009).  Suppression may be warranted "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights."  *Davis* v. *United States*, 564 U.S. 229, 238 (2011) (citation omitted).

18

Nothing in the government's use of a pole camera here indicates any disregard for the Fourth Amendment. "[W]hen the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." *Davis*, 564 U.S. at 249-250; *see also United States* v. *Madden*, 682 F.3d 920, 927 (10th Cir. 2012) (applying this principle). The pole camera monitoring here was authorized by binding precedent in *Jackson*. The use of the pole camera did not involve a physical intrusion onto Lucas's property. ATF's use of a pole camera did not involve any deliberate, reckless, grossly negligent conduct, and Lucas has not argued that the ATF was not operating in good faith when utilizing the pole camera footage. In applying the good-faith exception, "the knowledge and understanding of law enforcement officers and their appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers." *United States* v. *Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985). The images and footage obtained from the use of the pole camera footage should not be suppressed and/or excised from the affidavit and application for search warrant.

Even if the court were to eliminate all pole camera paragraphs from the affidavit, probable cause still existed to search Lucas's home. Paragraph 22 of the affidavit establishes that Officer Paulakovich, a member of the KCKPD, was suspicious of narcotic activity at the home. He reported numerous vehicles had fled from officers when attempting to stop them leaving Ruby Ave, including five different vehicles in the last six to eight weeks. He reported a high volume of vehicles in and out of the residence in the evening hours. That coupled with TFO Blackman's training and experience that cars failing to stop for police when leaving an address is a strong sign of narcotics trafficking, lending to the overall probable cause of the affidavit.

There was also the information in paragraphs 18-21 of the affidavit establish that Hicks, an established methamphetamine dealer, visited the house on Ruby on May 25, 2022 prior to an

undercover officer bought about 180 grams of methamphetamine from Hicks.  The affidavit made clear Hicks was seen exiting Lucas's house with a backpack that he later carried the methamphetamine that he sold to the undercover.  This, plus the above referenced information from KCKPD, established probable cause that there was drug trafficking occurring from the home.

### B. *Franks* hearing

TFO Blackman's affidavit carries a presumption of validity. *Franks*, 438 U.S. at 171.  To overcome this presumption, or secure a hearing on the issue, the defendant must make a "substantial preliminary showing" that "(1) an officer's affidavit supporting a search warrant application contains a reckless misstatement or omission that (2) is material because, but for it, the warrant could not have lawfully issued." *United States v. Moses*, 965 F.3d 1106, 1110 (10th Cir. 2020) (quoting *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015)).  "[A] substantial preliminary showing requires more than mere allegations of defects in a warrant." *Id.* Even if the prerequisite requirements are met, "and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-172.

Lucas argues the "limited information in the warrant affidavit that was not obtained from the pole camera"… "contains a number of false statements or omissions" that were material to the Magistrate Judge's finding of probable cause.  Doc. 105 at 22-23.  In support of that broad and sweeping statement, Lucas alleges two general categories in the affidavit where either false statements or omissions occurred: 1. The connection of Brandon Webb to this case and specifically 875 Ruby Ave (Lucas's home); and 2. The connection of Chaz Hicks to this case and

specifically 875 Ruby Ave.  Importantly, Lucas does not argue ATF incorrectly recounted what was seen on the pole camera footage.

In order to prevail on his *Franks* argument, Lucas must make a preliminary showing that: 1. The affiant's statement was deliberately false or demonstrated reckless disregard for the truth; and 2. The challenged statement or omission was essential to the magistrate's finding of probable cause.  *Franks v. Delaware*, 438 U.S. 154, 155-6, 171-2 (1978).  Lucas is not able to meet either, and certainly not both, of these requirements.

*1. Alleged false statements or omissions regarding Brandon Webb's connection to Lucas and 875 Ruby Ave.*

The defendant argues the affidavit and application for search warrant of Lucas's home at 875 Ruby Ave omitted information with respect to Brandon Webb's visit to the area of Lucas's home at 875 Ruby Ave.  With respect to Webb, the affidavit states:

> 24. On March 24th, 2022, members of ATF and KCKPD followed a known Southdale Blood member, Brandon Webb, to a residence in the 800 block of Ruby Ave.  Webb eventually left the area and law enforcement covertly followed him into Kansas City, Missouri, where he was arrested for a state warrant for Aggravated Kidnapping and Aggravated Battery.

(the affidavit at 8).

Lucas argues not that this information is false but that law enforcement omitted information material to the probable cause determination.  Doc. 105 at 23. One claimed material omission is the search warrant fails to include that law enforcement followed Mr. Webb to an address in Kansas City Missouri 10 miles away and fails to disclose "why law enforcement pursued someone who was wanted for aggravated kidnapping for such an extended period of time."  *Id.* at 23.  The government does not dispute law enforcement followed Webb to an address in Kansas City, Missouri, but Lucas does not articulate why the fact that law

enforcement pursued someone with an active warrant for 10 miles was an "extended period of time" and why omitting that information from the affidavit and application for search warrant demonstrated a reckless disregard for the truth. The omission of this information did not recklessly or intentionally mislead the Magistrate Judge.

Another claimed omission Lucas argues is that the vehicle Webb was driving was searched and no controlled substances were found during the search. To the contrary, Webb's car was searched and there were controlled substances found as a result of the search. Lucas's point that no controlled substances were found is not factually accurate, so can't be recklessly omitted or material to the search warrant.

The third alleged material omission Lucas points out is that Webb gave a statement and said he hadn't spent a lot of time in Kansas City recently. That Webb said that is not disputed. The KCKPD investigative report that details Webb's interview makes clear that Webb was being interviewed with respect to a state case, and not about Lucas's house. Additionally, TFO Blackman notes in that same report Lucas references in his motion (pg 24-5) that it was obvious Webb wasn't being truthful with TFO Blackman. It does not stand to reason that inclusion of information Webb gave in an unrelated interview is required under *Franks* when law enforcement does not believe the information is truthful or accurate.

There were two sentences included in the affidavit that referenced Brandon Webb. The government expects testimony from ATF to establish these sentences were included to merely show why ATF was interested in this area as part of their investigation, and as information that connected Lucas to Webb and South Dale Blood gang members. The intent of adding this information about Brandon Webb was not to show that Lucas was a drug dealer and supplied Brandon Webb with narcotics. In fact, if it were, information about the drugs found in Webb's

car would have been a good addition. The information about Webb was just part of this affidavit and was considered by the Magistrate Judge in light of all the other information presented in the eighteen-page affidavit. There was no malicious intent in leaving out any information with respect to Brandon Webb, and there was no effort on the part of ATF to mislead the Magistrate Judge, and testimony at the hearing will establish this fact.

*2. Alleged false statements and omissions related to Chaz Hicks.*

Lucas next alleges material information related to Chaz Hicks was either omitted from the affidavit or misstated in the affidavit. Doc. 105 at 24. Lucas's first alleged material omission is the fact that Hicks told the undercover he already had the requested methamphetamine on May 25, 2022 when the undercover requested it. The government anticipates TFO Blackman and Special Agent Belinda Perez will testify that Hicks told the undercover he had methamphetamine on him while he was at Lucas's house. The defendant must show that the affiant made an intentional or reckless false statement or omission, as opposed to omissions negligently made or by innocent mistake. *United States v. Artez*, 389 F.3d 1106, 1116 (10th Cir. 2004). The omission of this information was clearly an oversight and not intentional, because the addition of Hicks telling the undercover that he was in possession of methamphetamine while he was present at Lucas's house would have aided, not called into question, probable cause.

Lucas's second alleged group of material omissions relates to TFO Blackman's representations of Hicks's movements on May 25, 2022 before the undercover buy. Doc. 105 at 24-5. The information Lucas references in his Motion is contained in paragraph 21 of the affidavit and application for search warrant. *See* the affidavit at 9. Lucas argues there was important facts missing from the affidavit regarding law enforcement's observations of Hicks in the hour or so immediately before the controlled undercover buy on May 25, 2022, and that the

omission of these facts led the magistrate judge to draw an improper inference about whether Lucas supplied Hicks with methamphetamine on May 25, 2022.  Doc. 105 at 26.  ATF was surveilling Hicks for some time before the buy, so the government agrees there were facts that were known to law enforcement and not included in the affidavit.  If that were the only paragraph regarding Hicks in the affidavit, that may tend to support Lucas's argument that failing to include more details about Hicks was potentially misleading.  However, the information in this paragraph about the May 25 buy cannot be viewed in isolation and must instead be considered in the context of the other information in the affidavit.  The government anticipates TFO Blackman and Special Agent Perez will testify about all of the information their investigation revealed that supported the inference Hicks bought methamphetamine from Lucas on May 25, 2022, much of which was included in the affidavit and application for search warrant.  Consequently, Lucas fails to show how the claimed material omissions were recklessly or intentionally false or misleading, particularly in light of the other information included in the affidavit.

Lucas's third alleged category of omissions relates to Hicks's movements on other days, and specifically his location before and after the other controlled purchases and his possession of a red and black backpack on a date that was not included in the affidavit.  *Id*. at 25.  Lucas's argument is essentially that inclusion of other information about Hicks trafficking drugs on other days would have attenuated the inference that Lucas was supplying Hicks with methamphetamine.  *Id*.  Lucas argues "if the affidavit would have included that Mr. Hicks performed other controlled deliveries on other dates and was not seen near Mr. Lucas's residence on those dates, it would have contradicted this claimed connection."  Doc. 105 at 27.  The government does not dispute investigators had access to Hicks's GPS location data from Hicks's

cellphone beginning on April 16, 2022, however, GPS location data only provides so much information, and it must be interpreted and utilized in light of the broader context of the investigation.  Testimony at the motion hearing will illustrate the limitations of that technology in this case.

Lucas specifically points to an address on Sewell referenced in discovery and says information about that address should have been included.  *Id.* at 25.  The government anticipates testimony at the Motion hearing to establish ATF monitored that location as part of the investigation because investigators were attempting to determine where Hicks was living and thought the apartment complex on Sewell was potentially one of the places he was living.  Additionally, that Hicks was at another location before a different buy does not necessarily lead to the conclusion Lucas draws: that Hicks was being supplied methamphetamine by another person.  And, even if it does, that does not attenuate the clear connection articulated in the affidavit between Lucas and Hicks and methamphetamine trafficking.  The omitted information does not exculpate Lucas and establish that he was not in fact dealing methamphetamine to Hicks.  Lucas speculates that information about Hicks's movements on other days would have attenuated Lucas's connection to Hicks's drug trafficking activities, but he does not support his conclusory argument that this information was recklessly and maliciously omitted from the affidavit.

Omission of the details with respect to Hicks's movements on other days and before and after other buys did not demonstrate a reckless disregard for the truth.  Similarly to his point about the alleged material omissions from May 25, 2022, Lucas advocates for the court to consider this information in a vacuum and not in the context of the entire affidavit.  Lucas argues that the alleged material omissions, if included, would have dissipated the connection of Hicks

and Lucas to drug trafficking.  *Id.* at 27.  In another part of the affidavit, it's noted that Hicks was "observed almost daily at 875 Ruby" over a month period meeting with other people in short timeframes, "leading ATF to believe he is serving people narcotics outside the address."  The affidavit at 10.  The affidavit notes an instance on June 22, 2022 where ATF observed Lucas hand Hicks a large white square object that "looked to investigators like a gallon size plastic bag of methamphetamine" outside of 875 Ruby Ave.  The affidavit at 10-11.  In considering the context, it's clear the information Lucas says was not included in the affidavit was not omitted for the purpose of misleading the court.  There is no evidence the omission of the information regarding Hicks visiting other locations near the time of other buys or information that Hicks carried a red and black backpack on another day was done intentionally or recklessly.  Therefore, Lucas cannot make a substantial preliminary showing regarding the first element of his *Franks* challenge.

3. Materiality

None of the alleged omissions are material.  Under *Franks*, "a court may look behind a search warrant when the affiant intentionally or recklessly misleads the magistrate judge by making an affirmatively false statement or omits material information that would alter the magistrate judge's probable cause determination."  *United States v. Kennedy*, 131 F. 3d 1371, 1377 (10th Cir. 1997).  "An affiant's negligence or innocent mistake resulting in false statements in the affidavit is not enough to satisfy a defendant's burden."  *United States v. Corral-Corral*, 899 F.2d 927, 933 (10th Cir. 1990).

The defendant's motion is devoid of any substantive allegations or evidence that the misstatements or omissions were intentionally or recklessly made.  Materiality means that, with the purported defect removed, "the warrant could not have lawfully issued."  *United States v.*

*Moses*, 965 F.3d 1106, 1110 (10th Cir. 2020).  If instead, the affidavit contains intentional, knowing, or reckless omissions, a court must add in the omitted facts and assess the affidavit in that light.  *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990).  If the magistrate judge would not have altered her probable cause determination, even if he had been presented with the omitted material, then the warrant should be upheld.  *Id.* at 582-83.

Even if the affidavit and application for search warrant had included all of the facts the defendant claims should have been included in the affidavit, a reasonable magistrate still would have found probable cause to issue the warrants.  First, none of the omitted information was important enough to the case that inclusion of the information would have altered the probable cause determination.  None of the claimed omitted information was material.  Additionally, as noted above, the omissions Lucas complains about relate to a small subset of the 18-page affidavit and application in support of the search warrant.  There was a lot of information including in the affidavit that speaks directly to the issues Lucas brings up, including information about Hicks's almost daily visits to 875 Ruby and what law enforcement had generally seen on the pole camera outside 875 Ruby.  Lucas fails to articulate why the specific alleged omissions he points to are material and why they would have altered the Magistrate Judge's probable cause determination.

Lucas argues the omitted information about Webb is material because it's implied he was a drug dealer and yet no drugs were found on him when he was arrested.  As argued above, that is not factually accurate.  Additionally, even if the information Lucas's complains about with respect to Webb were included in the affidavit, the Magistrate still would have found probable cause, because Webb's involvement at 875 Ruby was such a small section of an affidavit that contained ample probable cause.

27

Lucas's arguments with respect to the information about Hicks similarly are taken out of the larger context of the warrant.  The inclusion of the information Lucas argues was omitted from the affidavit would not have attenuated Hicks's connection to Lucas given the other information about Hicks and Lucas in the affidavit and application for search warrant.  ATF saw Hicks going almost daily to 875 Ruby Ave and opined, based on training and experience, Hicks was being sold drugs by Lucas.  The inference that Hicks bought methamphetamine from Lucas was clearly articulated in other parts of the warrant that Lucas does not claim were false or recklessly included in the warrant.  The affidavit and application for warrant clearly connects Hicks to drug trafficking and Hicks to 875 Ruby.  The idea that Hicks visited other locations around the time of other drug deals and may have even bought drugs from others in addition to Lucas does not change the probable cause that existed in the affidavit to search 875 Ruby.  Lucas fails to articulate why all this extra information about Hicks, if included, would have called into question the probable cause to search 875 Ruby, in light of all the other information included in the affidavit.

In sum, any misstatements or omissions the defendant has attempted to identify were not material to probable cause and the Court should reject his *Franks* challenge.   Even if all the information Lucas complains about was included in the affidavit, the warrant still would have been issued, because the remainder of the affidavit Lucas does not argue was false or misleading established ample probable cause for the magistrate court to rely on in approving the search warrant of 875 Ruby Ave.

<u>**Conclusion**</u>

WHEREFORE, for the reasons argued in this motion, the government requests the court deny defendant Ernest Lucas's Motion for *Franks* hearing and to Suppress Evidence.

Respectfully submitted,

KATE E. BRUBACHER
United States Attorney

s/ Michelle McFarlane
MICHELLE MCFARLANE
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
Tel. 913-551-6730
Fax 913-551-6541
Michelle.Mcfarlane@usdoj.gov
Kan. S. Ct. No. 26824

<u>CERTIFICATE OF SERVICE</u>

I certify that on October 17, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a copy of the document along with a notice of electronic filing to all counsel of record.

<div style="margin-left:40%">

<u>s/ Michelle McFarlane</u>
MICHELLE MCFARLANE
Assistant United States Attorney

</div>